OPINION OF THE COURT
Philip J. Patti, J.
Claimant Joyce I. Gilbert was the owner of property located in the Town of Irondequoit by virtue of a deed dated December 28, 1984 and recorded in the Monroe County Clerk’s Office on February 5, 1985 in Liber 6659 at page 3 (exhibit 1). It consisted of five separate parcels on 6.989± acres, one of which was improved with a two-family structure having approximately 130 feet of frontage on Thomas Avenue on the east. It was bounded on the west by lands owned by the City of Rochester, on the north by lands owned by her husband Alfred Gilbert as well as lands of the defendant comprising the right-of-way for the Stutson Street Bridge, and on the south and east by lands formerly owned by the New York Central Railroad and others whose properties also fronted on Thomas Avenue (exhibit 4). A portion of her property was taken in fee pursuant to section 30 of the Highway Law and the Eminent Domain Procedure Law of the State of New York and is described in the taking map as “Stutson Street, B.I.N. 3317120 Over the Genesee River, Map No. 15, Parcel No. 15” and filed in the Monroe County Clerk’s Office on February 9, 2000. The defendant acquired in fee 1.83+ acres of claimant’s property along its northerly side and included all of the subject’s frontage property on Thomas Avenue (130+ feet) and westerly to the lands of the City of Rochester (exhibit 4). The foregoing date was stipulated by the parties as the date of acquisition. I adopt the description of the appropriated property as set forth on the aforesaid filed map. The court has viewed the property (Court of Claims Act § 12 [4]).
By way of background, claimant was the sole owner of the property described in the above-referenced deed, and she stated that she acquired it with her own funds. It abutted property owned by her husband Alfred to the north to whom she leased the property for $20,000 per year. According to claimant, he also paid the taxes as well as some other expenses. Through Voyager *554 Boat Sales, Inc., a corporation wholly owned by Mr. Gilbert,[1] he used the unimproved portion of claimant’s property for the storage of boats. Prior to the taking, Mr. Gilbert was able to access this acreage used for storage of boats from Thomas Avenue by use of a road that ran along the northerly portion of the improved portion of claimant’s property, as well as the property of Mr. Gilbert/Voyager as shown on exhibit 5. The red line on exhibit 5 designates the westerly boundary of claimant’s property prior to the taking; the designation “A” on the exhibit represents claimant’s property, while the “B” generally is Mr. Gilbert’s property. The red “R” on the exhibit shows the location of the road on the north side of the improved portion of claimant’s property which provided access to and from Thomas Avenue to the unimproved portion of claimant’s property. This is the area that was acquired by the defendant. It is noted that the Gilberts’ properties were accessible under one or more of the spans of the Stutson Street Bridge, as well as over lands leased on an annual basis by the City of Rochester to Alfred Gilbert/Voyager.
The appropriation in fee of 1.83+ acres involved the entire north end of the claimant’s property consisting of the two-family home and her entire frontage on Thomas Avenue; the road providing access from Thomas Avenue to claimant’s property to the west and south, as well as her homestead and the Alfred Gilbert/Voyager property. The remainder, consisting of 5.159+ acres of vacant land, is bounded by the City of Rochester to the west; the New York Central Railroad to the south; by private residences as well as lands owned by Alfred Gilbert and Joseph Bettinger as tenants in common, all with frontage on Thomas Avenue to the east; and on the north by the property taken by the defendant. As stipulated to by the defendant at trial (transcript at 121), the remainder has no access to Thomas Avenue. It is claimant’s contention that her remaining property is in fact landlocked and she has incurred significant consequential damages.
The defendant, while acknowledging that claimant’s remainder has no access to Thomas Avenue after the taking, maintains that it is not landlocked. It argues that prior to the taking, despite the fact that claimant owned the subject property separately from her husband and purchased it with her own *555 funds, there existed a “unity of use” between the two. As a result, it argues that claimant still has access over lands of her husband on the north to a roadway designated as Marina Drive, as well as access to Thomas Avenue on the east over lands co-owned by her husband and Bettinger.
In support of its contention, the defendant points out that claimant produced no written lease between her and Gilbert/ Voyager. It further argues that with respect to the income tax summaries produced for Voyager by Mr. Gilbert, he testified that the summaries did not show payment to claimant for rental of her land and that the only documentation he would have showing these payments would be the canceled checks over the years, which he did not have time to produce because of the number of checks involved (transcript at 155-159).
The defendant also argues that in 1988, and again in 1993, claimant and her husband and Voyager entered into mortgage consolidation and extension agreements covering her property as well as that of Voyager, guaranteeing payment of certain indebtedness owed by the parties to a Fred B. Kravetz and pledging their respective properties as security (exhibits B, C). It contends that, taken together, this proves that there was a unity of use between the properties separately owned by Mr. and Mrs. Gilbert.
Initially, I must address the issue as framed by the defendant as it pertains to unity of interest. It is well settled that there is a three-pronged test to establish unity between separate parcels: (1) unity of ownership, which is not the case here; (2) contiguity, which does exist here; and (3) unity of use (4A Nichols, Eminent Domain § 14B.03 [1] [3d ed]). The proof before me shows that the subject property supported the business of Voyager by providing a storage area for its boats as well as those of its customers. In addition, when called upon, claimant, her husband and Voyager pledged their properties as security for loans made in conjunction with the business of Mr. Gilbert and Voyager, as well as the loan made to claimant for the purchase of the subject property. Further, prior to the appropriation, the properties shared a contiguity facilitating accessibility from Alfred’s property to that of claimant in connection with the business of Voyager. While claimant and Mr. Gilbert both testified that she leased the subject property to Gilbert/Voyager, there is no written lease between the parties. Also, the marked tax summaries produced by Mr. Gilbert do not show a rental business expense. Although the defendant maintains that access *556 to the subject’s vacant portion was never gained by use of the road from Thomas Avenue but rather over Voyager’s property, that assertion was sharply contradicted by the testimony of claimant and her husband.
While some of claimant’s testimony is confusing as it relates to this issue, the record demonstrates that this road was used by Voyager and its customers, as well as others, to gain access to their boats. That is not to suggest that this was the sole means of access, since it is clear that access could be gained over the property of Mr. Gilbert and the City of Rochester prior to the appropriation. While defendant points to the mortgage consolidation and extension agreements as further evidence to support its unity of use theory, I believe it to be the least persuasive factor relating to that issue. It is clear that claimant owed Mr. Kravetz money relating to her purchase of the subject property. It is apparent that her husband also was indebted to Mr. Kravetz, and from a business standpoint it makes sense that Kravetz would seek to have as much security as possible to secure any loans that the claimant and her husband might owe to him. Moreover, considering the length of her marriage, claimant’s active involvement in running and building the business before suffering a serious injury and her obvious desire to see the business continue, I do not find it surprising that claimant would agree to pledge her property as collateral for the mortgage consolidation and extension agreements required by Kravetz. Therefore I do not give it as much weight as defendant on this issue in the aforesaid situation.
However, taking all the evidence before me as it relates to this issue, I am compelled to conclude that there was a unity of use between these two properties prior to the appropriation (cf. Guptill Holding Corp. v State of New York, 23 AD2d 434 [1965]).
That does not resolve the issue of whether the taking has landlocked claimant’s remainder. It is clear that claimant has lost her frontage on and access to Thomas Avenue. In fact, the defendant stipulated to this fact at trial (transcript at 121-122), and I so find in accordance with the aforesaid stipulation.
Claimant contends that after the taking she has not only lost access to Thomas Avenue but she no longer has any access to any public road or highway. Defendant maintains that claimant has access over the lands of Mr. Gilbert to the north and thus to Marina Drive, as well as over the parcel he co-owns with Bettinger to the south, which parcel has frontage to Thomas Avenue. In addition it argues that since the taking was in fee, and *557 not in fee without right of access, the claimant could seek permission from the defendant to establish a driveway over a portion of the appropriated area thus giving access to Alfred’s property and thence to Marina Drive. It argues that it was always the State’s intent to construct Marina Drive as part of this project and to use it as access for equipment and material for the new structure. For reasons not adequately explained on the record, that was not the case. As a consequence, in order for the defendant to gain access to the construction site, it was necessary for it to secure temporary easements over the property co-owned by Mr. Gilbert and Mr. Bettinger fronting on Thomas Avenue and claimant’s remainder, approximately two years after the appropriation date (exhibits I, J). While it is not clear from the record the date on which Marina Drive became a public thoroughfare providing access to the property of Alfred Gilbert, the City of Rochester lands and Voyager, it was years after the actual taking.
Defendant, relying upon Regan v Lanze (40 NY2d 475 [1976]), maintains that claimant is not landlocked since this was a taking in fee and not in fee without access. It argues that it is the defendant’s custom and practice not to reiterate claimant’s right as an abutting owner to access and hence does not state “with access” in circumstances such as the claim at bar. It then argues that claimant would need only to seek a permit from the defendant’s Department of Transportation (DOT) to construct a means to traverse the defendant’s right-of-way. According to defendant, a refusal to allow access over this area would be arbitrary and capricious.
I believe that defendant’s reliance on Regan is misplaced since that was really a case about the marketability of that plaintiff’s title, not access. In addition, Regan involved the acquisition of frontage of properties which already abutted a public highway and to which they already had access. The appropriated parcel became part of the right-of-way and as such “was burdened with the usual right of access of the abutting owners” (Regan v Lanze, 40 NY2d 475, 483 [1976], supra [citations omitted]). The property involved in Regan abutted the street both before and after the appropriation, a notable distinction from the claim at bar. Here the only public street which the subject property abutted was Thomas Avenue and the portion which abutted the street was acquired. Further, the new O’Rorke Bridge sits on this parcel, and there is no proof before me to support defendant’s contention that it would have granted her application to restore access to Thomas Avenue.
*558 With regard to the area under the fourth span of the bridge that was acquired by the defendant which separates claimant’s property from Marina Drive, Marina Drive was nonexistent on the date of the taking until at least three years thereafter. While Karen Brown[2] posited that Marina Drive was part of the project, rather than constructed to facilitate access to the construction, the defendant, again for unexplained reasons, opted to secure temporary easements over claimant’s property as well as the Gilbert/Bettinger parcel. When asked if the State had built that road, I was, and remain, puzzled by Ms. Brown’s response that “the project built Marina Drive” (transcript at 256). On a matter of critical importance regarding access to the remainder, her testimony concerning the issue of when Marina Drive was constructed was at best vague and at worst evasive. This is especially so in light of the recent decision of the Court of Appeals in Lake George Assoc. v State of New York (7 NY3d 475 [2006]). The Court in that case held that
“[p]roperty owners are entitled to consequential damages when the State’s appropriation of their property results in ‘the loss of their right to enter and exit their property’ (Pollak v State of New York, 41 NY2d 909, 910 [1977]; see also Priestly v State of New York, 23 NY2d 152 [1968]). Poliak makes clear that damages must be paid unless the condemnee retains ‘legal access’ — i.e. a legally enforceable right to entry and exit. Damages are to be quantified based on a calculation of the damages at the time of the taking with no effect given to subsequent efforts to reestablish access (see Wolfe v State of New York, 22 NY2d 292, 295 [1968]; Kravec v State of New York, 40 NY2d 1060, 1062 [1976]). This principle serves as strong incentive for the government to plan carefully and take only what is necessary or otherwise be subject to consequential damages (see Wolfe, 22 NY2d at 295-296).” (7 NY3d at 481.)
The Wolfe court makes clear (at 295) that
“[t]he amount of damages to which the claimant is. entitled as the result of an appropriation is to be measured and fixed as of the time of the taking. (See, e.g., Jackson v. State of New York, 213 N. Y. 34, 36; Kahlen v. State of New York, 223 N. Y. 383, 390; Queensboro Farm Prods, v. State of New York,
*559 6 Misc 2d 445, affd. 5 A D 2d 967, affd. 5 N Y 2d 977; Minesta Realty Co. v. State of New York, 26 A D 2d 592.)”
A further distinction between the claim at bar and the Lake George matter (Lake George Assoc. v State of New York, 7 NY3d 475 [2006], supra) is that the latter acquisition was made pursuant to Highway Law §§ 10 and 30. The former section vests broad authority and power in the Commissioner of Transportation to reestablish access over adjoining property. The subject property’s taking was pursuant to section 30 of the Highway Law and thus the Commissioner’s power and authority is limited. Consequently, I am constrained to base my opinion regarding damages arising as a consequence of the taking before me as of the date of the taking (Wolfe v State of New York, 22 NY2d 292 [1968], supra).
Even assuming that Marina Drive was supposed to provide access to the construction site at the time of the taking, it still does not give claimant access since her remainder does not abut that roadway. Further, I believe the defendant’s reliance on 17 NYCRR part 125 is misplaced. By design and definition part 125 refers only to accessing a state highway and there is nothing in the record that proves that Marina Drive falls under the aegis of that section. The fact remains that the subject property’s remainder does not abut any public thoroughfare. Therefore, I find that after the taking the subject property’s remainder is landlocked and consequential damages are appropriate.
The assertion proffered by defendant, that the claimant need only apply for a permit to cross the acquired area and it would have to be granted since a denial would be arbitrary, is rejected because it does not equate to a right of access to the remainder (see Windham v State of New York, 34 AD2d 590 [1970], lv denied 27 NY2d 481 [1970]). The courts have held that the State cannot require the claimant to create a road over a public right-of-way to provide access to the remainder when it was the State that destroyed it in the first instance (Wolfe v State of New York, 22 NY2d 292 [1968], supra; Gluckman v State of New York, 37 AD2d 870 [1971]).
Similarly, the cost-to-cure theory urged by the defendant, which would require claimant to extend a service road to her property from an adjoining parcel, may not be used in this instance since to do so requires her to go outside the boundary line of the remainder (St. Patrick’s Church v State of New York, 30 AD2d 473 [1968]).
*560 The defendant also argues that the claimant is under a duty to mitigate damages, which suggested duty would compel her to compel her husband to either buy his co-tenant Bettinger’s interest in the property which has frontage on Thomas Avenue, or in the alternative to commence a partition action against Mr. Bettinger to secure ownership of that parcel. The defendant contends that Mr. Gilbert exercised both dominion and control over that parcel as well as his wife’s premises, relying upon his statement at trial that since her injury she has been limited to “go for” duties in the operation of the business. I do not find that statement in any fashion establishes his complete control over her property. It fails to acknowledge that both Mr. and Mrs. Gilbert testified that, while her role in sales has been curtailed because of her injury, she still participates in business decisions and he still seeks her advice in the operation of Voyager. It argues that in the option agreement (exhibit F, 1Í 5.c), Mr. Gilbert agreed to undertake a partition action if he were unable to obtain sole ownership. No demands ever materialized and the option was not exercised, but even if it had been, there is no certainty that he would be successful in securing sole ownership of the parcel. It is just as likely that Mr. Bettinger could successfully defend the action or that a third party could ultimately secure ownership. Moreover, I place little probative weight on the assertion by defendant that the placing of a Voyager boat sign on this jointly-owned parcel was evidence of Mr. Gilbert’s dominion or control over this parcel to the exclusion of Mr. Bettinger’s interest in it.
Furthermore, defendant’s contention that its offer to Mr. Gilbert to leave a commercial driveway over these jointly-owned lands at the conclusion of the construction and that he refused, does not demonstrate his control over the use of this property. Rather, to the contrary, it demonstrates that Mr. Gilbert lacked the dominion and control as it relates to the use of this property that defendant argues he possessed.
I further find that defendant’s contention that there is a unity of interest in this case must also fail. Claimant is seeking severance damages suffered by her property as a result of the taking, not as a result of the defendant’s taking of some adjoining property which has affected her interest. In its simplest form, claimant seeks consequential damages to her remaining parcel since she has been deprived of access to a state, county or local public road or highway. The fact that I find a unity of use prior to the appropriation does not, perforce, compel me to find there *561 is a unity of interest, especially on these facts, and I decline to do so based on the proof in this record.
Finally, I find defendant’s position that claimant must mitigate damages by employing a cost-to-cure is without merit in this case since it would compel claimant (not her husband) to go outside the boundary lines of her property to obtain property rights in order to remedy her loss of access, which is not consistent with existing case law (Gluckman v State of New York, 37 AD2d 870 [1971], supra; Donaloio v State of New York, 99 AD2d 335, 338 [1984], affd 64 NY2d 811 [1985]; but see Fodera Enters. v State of New York, 275 AD2d 85 [2000], and Matter of County of Schenectady [Pahl], 194 AD2d 1004 [1993], lvs denied 83 NY2d 756 [1994], 84 NY2d 806 [1994]).
One final note regarding Marina Drive, the record establishes that the Town of Irondequoit was unable to acquire the necessary property to complete the access to the defendant’s right-of-way as anticipated in its construction plans. It is clear that this road was never to be a state highway or road but rather was to be constructed by and dedicated as a town road. To accomplish this it became necessary for a private third party to acquire the necessary property and donate it to the Town to finally construct the Marina Drive access. As noted above, this was a critical reason the defendant secured a temporary easement over claimant’s remainder as well as over the lands co-owned by Gilbert/Bettinger.
Claimant’s appraiser opined that the highest and best use for the subject property before the taking was for commercial use compatible with the area’s “commercial uses utilized in conjunction with water frontage and necessary supporting uses,” including retail, motels, restaurants, boat sales and storage (exhibit 2, at 27). After the taking, his opinion was that it was landlocked and therefore of reduced commercial potential and of use only in conjunction with adjacent property.
The defendant’s appraiser, on the other hand, divided the property into two distinct parcels he designated as economic unit No. 1 (improved) and economic unit No. 2 (unimproved). In the before-taking analysis he opined that the highest and best use for the improved parcel was as multi-family residential use (exhibit A, at 27). His opinion of the highest and best use of the unimproved portion of the subject property (economic unit No. 2) was for low density commercial and multi-family residential development (exhibit A, at 47).
After the taking, economic unit No. 1 has been taken in whole, leaving only the unimproved portion of the subject property, *562 economic unit No. 2, to be considered. Defendant’s appraiser opined that this parcel’s highest and best use remained unchanged. He assumed that after the taking Marina Drive would provide access to the subject property. This assumption of course was based upon the defendant’s agreement to some application initiated by claimant to gain access over the area taken in fee by defendant. This assumption has been rejected by the courts and consequently is without any legal support (Guptill Holding Corp. v State of New York, 23 AD2d 434 [1965], supra). Anticipating that this theory might be unacceptable, he then opined that a cost-to-cure approach was available and should be employed in his valuation of after value. He includes as exhibit 7 of the appraisal his analysis of how this cost-to-cure would be utilized. He again opines that the temporary easement taken by defendant over the Gilbert/Bettinger property would become permanent. This fails to acknowledge that case law does not look with favor upon such a cost-to-cure that requires the claimant to go outside of her boundaries as noted above, but he concludes that in this case it is an appropriate alternative “because of a unity in title between Alfred and Joyce Gilbert, the cost-to-cure is technically not outside the property bounds and can legitimately be considered.” Unfortunately, that is not the case as there is nothing in this record that in any way establishes that there is a unity of title between Alfred and claimant. While there is a unity of use that existed prior to the taking, there is nothing that establishes this so-called unity of title and his theory regarding a cost-to-cure is rejected.
However, to defendant’s appraiser’s credit, in anticipation that both of his opinions regarding value premised on access being available to the subject property’s remainder could be rejected by me, he alternatively valued the remainder as landlocked and concluded that in this instance its highest and best use was for accessory commercial use (exhibit 6-1 of exhibit A).
I find the highest and best use for the subject property prior to the taking to be for commercial use. I find the subject property’s highest and best use after the taking to be for sale to adjoining owners, noting that that may include a multitude of purposes consistent with the zoning at the time of the taking which was “River Harbor District” allowing commercial and residential development, which in my opinion is consistent with the opinions of both appraisers.
In arriving at the before value of the subject property, I considered the sales of both experts as they related to the value *563 of the land as vacant. I am aware that this required me to reject defendant’s analysis of economic unit No. 1. However, it does not in my opinion preclude me from examining his sales for economic unit No. 2 and applying the subsequent analysis to the entire property as if it were vacant.
I considered defendant’s land sale No. 4 in determining the subject property’s before and after value, particularly since the other comparable sales he offered required substantial “absolute” adjustments, to wit, 55% for land sale No. 2; 50% for land sale No. 5; and 45% to land sale No. 6 (exhibit A, at 48), all of which in my opinion are too excessive to really be considered comparable.
With regard to land sale No. 4, I have applied a negative adjustment to this sale to reflect that it occurred some three years after the appropriation. An increase in the positive adjustment for size made by defendant’s expert to this sale is required to reflect the difference in size between this sale and the subject property. I also disregarded the adjustment to the sale for “shape,” as I do not agree that there is as great a difference between the two properties to support the purported difference found by the defendant’s appraiser. With these adjustments to defendant’s appraiser’s comparable sale No. 4, the subject property’s before value would be $66,425 per acre.
Regarding claimant’s comparable sales, I also encountered problems with respect to the adjustments made by her expert and his analysis of the sales as a whole. Claimant’s sale No. 1 is located on Culver Road in the Town of Irondequoit but further to the east in an area that was economically lagging in growth. While in the area of Irondequoit Bay, it offered no access to the bay. It is adjacent to the amusement park known as Seabreeze and is zoned commercial. It was acquired in 1992, but the expert made no adjustment for time, further supporting my belief that commercial development in this area was somewhat stagnant with the exception of the amusement park which was periodically upgrading rides it offered to the public. It contained 3.5± acres and had 200± feet of frontage on Culver Road. While it sold for $95,714 per acre, it was approximately half the size of the subject property and requires a downward adjustment to reflect the difference in size. I accept the expert’s upward adjustment for topography to reflect the subject property’s superiority. He also adjusted the sale upward to reflect the sale’s less superior location but I find that it warrants a lesser adjustment.
With respect to sale No. 2, I believe that the size difference was so great, with the subject property being more than four *564 times larger, that I accorded it no weight in arriving at my determination of the subject property’s before value. To try to adjust for this difference would entail such a significant adjustment to render this sale incomparable and so I have rejected it. Sale No. 3 was accorded little or no weight because the size differential, approximately one third that of the subject, as well as a measurable negative location adjustment, both minimize its relative comparability.
I have given greater consideration to sale No. 4, since it was the most comparable in size to the subject property. Its location is superior to the subject property and a downward adjustment is required. Also this property has reduced frontage on Panorama Trail in Penfield by a perimeter easement to an adjoining owner which according to the appraiser would require development of this property at a considerable distance from the highway, thus warranting a positive adjustment to reflect the subject property’s superior utility. The difference in topography between the subject property and sale also warrants a negative adjustment to reflect their respective conditions.
Finally, I considered claimant’s sale No. 5, but have applied a negative adjustment to properly reflect the subject property’s larger size, as I have done in sale No. 1. I have made a larger downward adjustment than that applied by her expert to the sale to reflect its superior location in an attempt to bring it into parity with the subject property.
After consideration of all the sales as adjusted, with greater weight accorded to claimant’s sale No. 4, I fix the before value of the subject property at $99,370 per acre for 6.989± acres or $694,500(E).
In light of my finding that the remainder of claimant’s property is now landlocked and of value to adjoining owners for development as permitted under the existing zoning, I have considered the sales as proffered by each party. The defendant’s proposed comparable sales are located in close proximity to the subject property and are accorded somewhat greater weight after further adjustment. Of the sales offered by claimant, I considered only sale No. 7. I negatively adjusted the sales price of the two sales relied upon by the defendant (sales Nos. 2 and 7 respectively; see exhibit 6-4 of exhibit A) for time to reflect the fact that they occurred two and three years after the taking. Likewise, I made a positive adjustment for size to claimant’s sale No. 7 to reflect the subject property’s smaller size and hence higher per acre value.
*565 I find the after value of the remaining 5.159+ acres to be $24,525 per acre or a total of $126,525(R).
I fix claimant’s damages as follows:
Before Value:
6.989+ acres @ $99,370/acre
$694,500(R)
Site Improvements[3]
$8,500
$703,000
After Value:
5.159+ acres @ $24,525/acre
$126,525(R)
TOTAL DAMAGES
$576,475(R)
Claimant’s damages are allocated as follows:
Direct Damages:
1.83+ acres @ $99,370/acre
$181,850(R)
Site Improvements
$8,500
Consequential Damages:
$386,125(R)
TOTAL DAMAGES
$576,475(R)
Therefore, claimants are awarded $576,475 for all damages. As in Sokol v State of New York (272 AD2d 604 [2000]), where nothing in the record established the date of personal service of the notice of acquisition on that claimant, interest on the award should not be suspended pursuant to EDPL 514 (B) for any period preceding the filing of the claim. Interest, however, was suspended by me with the consent of the parties, in an amended scheduling order filed on October 19, 2006 (dated Sept. 29, 2007 [sic], should have been 2006), for the period from January 9, 2007 until April 23, 2007. Accordingly, this award shall be inclusive of interest from the stipulated date of acquisition and accrual, February 9, 2000, until its suspension from January 9, 2007 until April 23, 2007, with interest resuming until the date of this decision, and thereafter to the date of entry of judgment herein, pursuant to CPLR 5001 and 5002, and subject to Court of Claims Act § 19 (4).
The award to claimant herein is exclusive of the claims, if any, of persons other than the owner of the appropriated prop *566 erty, its tenants, mortgagees or lienors having any right or interest in any stream, lake, drainage, irrigation ditch or channel, street, road, highway or public or private right-of-way or the bed thereof within the limits of the appropriated property or contiguous thereto; and is exclusive also of claims, if any, for the value of or damage to easements or appurtenant facilities for the construction, operation or maintenance of publicly owned or public service electric, telephone, telegraph, pipe, water, sewer or railroad lines.
All motions not heretofore ruled upon are now denied. To the extent that claimant has paid a filing fee, it may be recovered pursuant to Court of Claims Act § 11-a (2).

. Claimant was not a shareholder of that corporation but was an officer. She actively sold boats until she was injured in a fall. After the fall she still participated in the business but in a more restricted manner.

. A DOT civil engineer who worked in the structures design group on the O’Rorke Bridge project.

. While claimant suggested no value for site improvements (exhibit 2, at 46), the defendant’s appraiser in exhibit A (at 46, 58), and in his testimony (transcript at 300), described a gravel parking area, some chain link fencing and a light pole, which he valued at $8,500(R).